UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SABITA O.,[1] | ) |
|                 Plaintiff, | ) 19 CV 5822 |
| v. | ) Magistrate Judge Young B. Kim |
| ANDREW M. SAUL, Commissioner of Social Security, | ) |
|                 Defendant. | ) April 29, 2021 |

### MEMORANDUM OPINION and ORDER

This case illustrates the evidentiary challenges a claimant faces when she applies for social security disability benefits years after her date last insured has passed. Sabita O. seeks disability insurance benefits ("DIB") based on her claim that she is disabled by rheumatoid arthritis and its resulting symptoms. She filed her DIB application five years after her date last insured, and the Commissioner of Social Security denied her claim. Sabita now seeks judicial review of that decision. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Sabita's motion is denied and the Commissioner's is granted:

### Background

Sabita filed her DIB application in September 2016, claiming that she became disabled in June 2006, when she was 49 years old. (Administrative Record "A.R." 66.) After her DIB claim was denied initially and upon reconsideration, (id. at 72, 81), Sabita was granted a hearing before an administrative law judge ("ALJ"). Because Sabita's insured status expired on March 31, 2011, five years before she filed her application, the ALJ was tasked with determining whether she established that she was disabled in the period between her June 2006 alleged onset date and March 2011. The ALJ issued a decision concluding that she did not. (Id. at 15-23.) The Appeals Council denied Sabita's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Sabita then filed this lawsuit seeking judicial review of the Commissioner's decision, and the parties consented to this court's jurisdiction. (R. 11); *see* 28 U.S.C. § 636(c).

### Facts

Sabita relies on her documentary evidence and hearing testimony to support her claim for DIB.

**A. Medical Evidence**

The bulk of documentary evidence Sabita submitted in support of her DIB claim post-dates her date last insured by several years. Documents from 2013 through 2018 show that Sabita received regular treatment from Dr. Monika Starosta, a rheumatologist. During that period Dr. Starosta reported varying degrees of success in treating Sabita's rheumatoid arthritis-related pain and stiffness with steroids and other medications. Under her care Sabita at times reported improvement and only mild or minimal pain in her hands, neck, and feet.

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the claimant's first name and last initial throughout this opinion to protect her privacy to the extent possible.

2

(See, e.g., A.R. 724-25, 833, 837, 882, 896.) But at other times in this period Sabita reported daily, generalized pain without relief, (id. at 757, 811), and Dr. Starosta consistently wrote that Sabita had abnormalities in her fingers and wrists with reduced flexion, (id. at 721, 737, 749, 826, 831, 835, 839, 843).

In April 2018 Dr. Starosta submitted a residual functional capacity ("RFC") questionnaire on behalf of Sabita's DIB application and opined that she has significant functional limitations, including standing for only five minutes, sitting for ten minutes, walking for one block, and lifting and carrying less than five pounds. She also wrote that Sabita has trouble with fine manipulation and grasping because of hand pain and stiffness. (Id. at 994.) However, Dr. Starosta was not able to say whether those limitations existed before Sabita's March 2011 date last insured. In fact, she wrote that she had no access to records or ability to address Sabita's limitations before March 2011. (Id. at 995-96.)

Although her treatment for rheumatoid arthritis is well documented starting in 2013, records reflecting Sabita's symptoms during the relevant period—from June 2006 through March 2011—are comparatively meager. Sabita's alleged disability onset date closely followed a 2006 hospitalization for pneumonia, and in 2008 she had her first consultation with rheumatologist Dr. Robert Hozman. Her chief complaint at that consultation was foot pain, but she also complained of achy hands and wrists. (Id. at 372.) Dr. Hozman noted that Sabita "would benefit from physical therapy," (id.), and ordered a bone scan because Sabita reported that her wrist and ankle pain had been present "for years, getting worse," (id. at 305). The bone scan results were consistent with polyarthritis. (Id. at 305.)

In January 2010 Sabita's long-time physician, Dr. I. Singh, prescribed prednisone, a steroid used to treat arthritis. (Id. at 786.) A week later Sabita reported that she was feeling better on prednisone. (Id.) In January 2011—just two months before her date last insured—Sabita had a consultation with Dr. Stacy Ban, who noted that without medications Sabita had significant pain tied to rheumatoid arthritis, but after starting prednisone she was "currently without symptoms." (Id. at 257.) In June 2011—three months after her date last insured—Sabita told her doctor she was doing well. (Id. at 254.) In May 2012 Sabita was again hospitalized for pneumonia, but a musculoskeletal exam at that time showed no swelling, no tenderness, normal range of motion, and normal strength. (Id. at 511.)

In 2017 two consulting physicians reviewed Sabita's medical records and concluded that there was insufficient evidence on which they could evaluate her claim of disability prior to her date last insured. (Id. at 69, 78.) In May 2018 Dr. Singh submitted an RFC questionnaire on Sabita's behalf, noting that their treatment relationship extended back to 1995. (Id. at 997.) Dr. Singh opined that Sabita has significant limitations in all domains. He wrote that she is unable to stand for more than five minutes or sit for more than ten to fifteen minutes and that she must lie down at least every three hours. He further opined that Sabita can walk only one block and lift and carry less than five pounds. Dr. Singh also wrote that Sabita has trouble with fine manipulation and grasping, noting that she

has joint disease in her hands and wrists. (Id. at 998.) Unlike Dr. Starosta, Dr. Singh did opine on Sabita's condition prior to her date last insured and wrote that the limitations in his RFC assessment applied since before March 31, 2011, and that they have "been slowly more disabling." (Id. at 999-1000.)

**B.  Hearing Testimony**

At her June 2018 hearing before the ALJ, Sabita testified that she stopped working after her 2006 hospitalization and a subsequent dental surgery because she had to be home for three months and was laid off. (A.R. 37-38.) She testified that she tried looking for a new job after her layoff but that she was not able to work eight-hour days. (Id. at 40.) Sabita said that in 2011 her pain was so bad it was hard to focus or get out of bed, and that she could stand for only five to ten minutes and sit for only ten minutes before needing to lie down. (Id. at 39, 45, 49.) She testified that medication prescribed by a rheumatologist helped somewhat with pain, but only for about an hour. (Id. at 44, 46.) Sabita acknowledged that she had medical insurance coverage from 2006 through 2011. (Id. at 35.)

**C.  The ALJ's Decision**

The ALJ engaged in the standard five-step evaluation process in considering Sabita's DIB claim. *See* 20 C.F.R. § 404.1520(a). At steps one and two the ALJ found that Sabita did not engage in substantial gainful activity between her 2006 alleged disability onset date and her March 2011 date last insured, and that she suffered from the severe impairment of rheumatoid arthritis/inflammatory polyarthropathy during that period. (A.R. 17.) At step three the ALJ determined that Sabita's impairment was not of listings-level severity. (Id. at 18.)

Before turning to step four, the ALJ determined that during the relevant period Sabita retained the RFC for light work, but that she was limited to frequent grasping. (Id.) In explaining that determination, the ALJ wrote that the medical evidence documenting her condition before her date last insured is minimal—even though she had health insurance during that period—and does not support Sabita's contention that she was so limited prior to March 2011 that she could sit or stand for no longer than ten minutes. (Id. at 19-20.) The ALJ pointed to Sabita's 2006 hospitalization records showing that she denied rheumatoid arthritis flares, had no edema and 5/5 strength throughout, and reported being very active. (Id. at 20.) The ALJ commented that many of the treatment notes from the relevant period are difficult to decipher but noted that they appear to demonstrate that Sabita had no neurological, motion, or strength deficits. (Id.) She also noted that Sabita failed to follow through with recommended physical therapy and told a physician in January 2011 that she had "no current symptoms." (Id.)

In weighing the opinion evidence the ALJ gave some weight to the consulting physicians' opinions that the evidence from the relevant period is insufficient, but only little weight to the RFC opinions of Drs. Starosta and Singh. (Id. at 21-22.) The ALJ explained that because Dr. Starosta was unable to provide any insight into Sabita's condition prior to the date last insured, her opinion was of little utility. (Id. at 22.) With respect to Dr. Singh's opinion regarding Sabita's condition before

March 2011, the ALJ was unpersuaded by it because she found it to be inconsistent with the objective evidence—including Sabita's report of no arthritis flares in 2006, her limited treatment history, and practitioners' benign findings—as well as Dr. Singh's own notes indicating that she had no neurological deficits. The ALJ noted that Dr. Singh's records are not wholly legible, but she found it notable that he did not refer Sabita to a rheumatologist until two years after her alleged disability onset date. (Id.) In short, the ALJ determined that the record was insufficient to support a finding that prior to her date last insured Sabita's rheumatoid arthritis was as severe as she and Dr. Singh alleged.

At step four, the ALJ concluded that based on her RFC Sabita was able to perform her past relevant work as a quality control worker prior to her date last insured. (Id.) Accordingly, the ALJ decided that Sabita was not disabled during the relevant period and denied her DIB claim. (Id. at 23.)

## Analysis

Sabita raises two challenges to the ALJ's decision in her motion for summary judgment: (1) the ALJ improperly discounted Dr. Singh's opinion; and (2) she erred in concluding that Sabita was capable of frequent grasping before her date last insured. In reviewing the ALJ's decision, this court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, __ F.3d __, 2021 WL 1399281, at *2 (7th Cir. Apr. 14, 2021) (quotation and citation omitted).

### A. Dr. Singh's Opinion

Sabita argues that the ALJ was wrong to assign only little weight to Dr. Singh's opinion, taking issue with each of the reasons the ALJ provided in explaining that decision. The applicable regulations allow the ALJ to consider several factors in weighing a treating physician's opinion, including the nature and length of the treating relationship, the supportability of the opinion, and its consistency with the overall record. *See* 20 C.F.R. § 404.1527(c) (applicable to claims filed before March 27, 2017). The ALJ only needs to "minimally articulate" how she weighs the treating physician's opinion, *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (citation omitted), and the court will "uphold all but the most patently erroneous reasons" the ALJ provides for discounting the opinion, *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quotation and citation omitted).

In challenging the ALJ's assessment of Dr. Singh's opinion, Sabita faults the ALJ for noting that the extreme limitations assigned by Dr. Singh were not supported by any neurological findings, without explaining why such findings would be meaningful in a patient with rheumatoid arthritis. (R. 20, Pl.'s Mem. at 11-12.) To be clear, the ALJ wrote that Dr. Singh's opinion was inconsistent with the

totality of the objective record before Sabita's date last insured, including his own notes regarding her absence of neurological deficits. (A.R. 22.) Sabita does not point to any records from the relevant period supporting the extreme limitations Dr. Singh assigned. As the government concedes, musculoskeletal findings might be more directly relevant to Sabita's condition, but neurological findings with respect to gait or sensation appear to be relevant to Dr. Singh's opinion that Sabita could walk for no more than one block and had limitations in fingering and grasping prior to 2011.[2] Accordingly, Sabita has not shown that this reason for discounting Dr. Singh's opinion was patently wrong. *See Stepp*, 795 F.3d at 718.

Sabita also faults the ALJ for pointing to evidence from 2006 to 2008 to discount Dr. Singh's opinion with respect to her condition prior to March 31, 2011. Specifically, she faults the ALJ for noting that she had no arthritic flares in 2006 and for highlighting that Dr. Singh did not refer her to a rheumatologist until 2008. (R. 20, Pl.'s Mem. at 12.) Sabita argues that her condition in 2006 had no bearing on her limitations in 2011 and that the 2008 referral illustrates that her condition deteriorated between 2006 and 2008. The court disagrees because although Sabita states in her brief that her hearing counsel informed the ALJ that she would accept a disability finding as of any date before her 2011 date last insured, (id. at 8-9), her alleged onset date was in 2006. The ALJ was entitled to review evidence from that period in weighing the physician's opinion. Also, in addition to a lack of flares in 2006, the ALJ pointed to relatively benign findings from other practitioners and Sabita's limited treatment history. (A.R. 22.)

Reading the ALJ's decision in its entirety, *see Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), the court concludes that the ALJ provided an adequate basis for those observations. The ALJ pointed out that the available records note no motion or strength deficiencies, which directly contradicts Dr. Singh's opinion. (A.R. 20.) The ALJ further observed that in January 2011, less than three months before her date last insured, Sabita told a doctor she had "no current symptoms" while taking prednisone. (Id.) Finally, she noted that Sabita's physician recommended that she engage in physical therapy during the relevant period, but she failed to follow through with this recommendation despite having health insurance. (Id.) These observations support the ALJ's conclusion that the objective evidence does not support Dr. Singh's opinion with respect to her walking, sitting, standing, and grasping limitations before March 31, 2011. Accordingly, Sabita has failed to show that the ALJ erred in explaining why she assigned only little weight to Dr. Singh's opinion.

**B.    RFC Assessment**

Sabita also challenges one aspect of the ALJ's RFC assessment—the limitation to frequent bilateral hand grasping.[3] According to Sabita, the ALJ failed

---

[2] Rheumatoid arthritis can have neurologic manifestations. *See* Ruffing, Victoria & Bingham, Clifton, *Rheumatoid Arthritis Signs and Symptoms*, https://www.hopkinsarthritis.org/arthritis-info/rheumatoid-arthritis/ra-symptoms/ (last visited April 29, 2021).

[3] Sabita also objects to the VE's testimony that a significant number of jobs are available in certain job categories. This testimony does not pertain to Sabita's past relevant work, but instead to job categories the ALJ might have considered had she proceeded to step five of the sequential analysis. Because the ALJ ended the

to support the conclusion that she was able to engage in grasping for two-thirds of the day before her date last insured. As an initial matter, Sabita bears the burden of demonstrating that her condition was disabling prior to March 31, 2011. *See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). In challenging the RFC, Sabita does not argue that the ALJ overlooked or mischaracterized evidence, played doctor, failed to articulate her reasons, made logical errors, or cherry-picked the record in reaching her conclusion with respect to Sabita's grasping limitations during the relevant period. Rather, she only takes issue with respect to the ALJ's judgment regarding the level of limitation the record supports. The standard of review does not allow this court to second-guess the ALJ's judgment in this respect, and if the ALJ builds a logical bridge between the evidence and her conclusion, the court must affirm the decision. *See Deborah M.*, 2021 WL 1399281, at *2; *Rice*, 384 F.3d at 369.

That logical bridge exists here. The ALJ rested her conclusion on the relatively limited treatment record from the relevant period and the lack of records supporting a greater grasping limitation. The ALJ also found a mismatch between Sabita's description of her pain before 2011 and her testimony that during that time she was able to cook meals, drive, and perform light house work (which included, according to her testimony, activities that require grasping, like folding laundry, loading and unloading the dishwasher, and dusting). (A.R. 21, 50-51.) The ALJ pointed to Sabita's failure to pursue recommended physical therapy and the record

analysis at step four and did not make an alternative step-five finding, Sabita has no basis for challenging this aspect of the VE's testimony.

indicating that she told a doctor in 2012 that she was very active. (Id. at 20.) The ALJ further relied on records demonstrating that during the relevant period Sabita did not have swelling in her extremities, demonstrated 5/5 motor strength, and reported no complaints of weakness. The ALJ also relied on Sabita's January 2011 statement that she had no current symptoms.

Sabita's arguments with respect to the RFC largely mimic those she raised regarding Dr. Singh's opinion—that the ALJ should have given more weight to Dr. Singh's opinion, that comments from 2006 have little bearing on her condition in 2011, and that the ALJ failed to explain how normal neurological findings undermine her rheumatology symptoms. Those arguments are unpersuasive with respect to the RFC determination for the same reasons described above. Although reasonable minds may disagree about what the evidence from the relevant period shows with respect to Sabita's grasping abilities, the ALJ properly supported her conclusion with substantial evidence. *See Burmester*, 920 F.3d at 510.

The only aspect of Sabita's argument that gives the court pause is her observation that the ALJ characterized some of the medical notes from the relevant period as being illegible, and her argument that nothing in the regulations allows an ALJ to reject evidence because it is impossible to decipher. (R. 20, Pl.'s Mem. at 10.) But Sabita neither develops this argument nor argues that there are notes the ALJ found to be illegible that would support greater grasping limitations during the relevant period. Sabita does not argue that the ALJ should have re-contacted any

physicians to seek clarification.[4] In fact, in an attending footnote Sabita seems to suggest that the problem is not that the ALJ found some of the records to be illegible, but that she cited certain records that were typed or computer-generated in making that assertion. (Id. at 10 n.4.) In other words, Sabita seems to cast doubt on the idea that the records the ALJ cited were in fact illegible.

Some courts in this circuit have stated that an ALJ confronted with indecipherable doctors' notes should contact those doctors for clarification. *See Lauren J. v. Saul*, No. 17 CV 8138, 2019 WL 5864833, at *6 n.3 (N.D. Ill. Nov. 7, 2019) (collecting cases). But in at least one instance, the Seventh Circuit held that an ALJ is not required to accept a physician's opinion where the notes in support were of such poor quality that they were impossible to decipher. *Gildon v. Astrue*, 260 Fed. Appx. 927, 929 (7th Cir. 2008). Sabita's two-sentence reference to illegible records fails to address any of this authority or the principles discussed therein, and her argument with respect to how the ALJ should have handled any illegible records is conclusory and underdeveloped. Accordingly, the court concludes that she has waived this aspect of her argument as a basis for reversal. *See Carter v. Astrue*, 413 Fed. Appx. 899, 906 (7th Cir. 2011) (noting that a claimant's failure to develop an argument or presentation of conclusory analysis results in waiver).

---

[4] In her brief, Sabita references the fact that her rheumatologist during the relevant period had retired years prior to her hearing before the ALJ, so as a practical matter, contacting that doctor may not have been a possibility. (R. 20, Pl.'s Mem. at 5.)

## Conclusion

For the foregoing reasons, Sabita's motion for summary judgment is denied, the government's is granted, and the decision of the Commissioner is affirmed.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**